UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
ASSET CO IM REST, LLC *et al.*,             :

                  Plaintiffs,      :

                      :          23 Civ. 9691 (JPC)

      -v-                :

                      :        <u>OPINION AND ORDER</u>

GERALD "JERRY" KATZOFF *et al.*,   :

                 Defendants.   :

------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

       This case adds the latest chapter to a years-long dispute over intellectual property related to a prominent chain of Italian restaurants under the Il Mulino brand. *See, e.g.*, *BSP Agency LLC v. Katzoff (In re KG Winddown, LLC)*, 632 B.R. 448 (Bankr. S.D.N.Y. 2021). Pending before this Court is the motion of Plaintiffs Asset Co IM Rest, LLC, Il Mulino Joint Ventures, LLC, and Receivables IM Rest, LLC for a preliminary injunction pursuant to Federal Rule of Civil Procedure 65. Plaintiffs seek to restrain Defendants Gerald "Jerry" Katzoff, IMNY GS, LLC, West 3rd Holdings, LLC d/b/a Il Giglio Tribeca, West 3rd Products, LLC, IM LLC-I, and GFB Restaurant Corp. from using trade dress of a former restaurant on 361 Greenwich Street in Manhattan called Il Mulino Tribeca, Il Mulino's proprietary recipes, property from Il Mulino Tribeca, and the names Il Giglio and Il Giglio Tribeca, all of which Plaintiffs claim either belong to them or cause confusion with intellectual property owned by them, including the registered trademarks IL MULINO and IL MULINO NEW YORK.

       The Court heard argument on Plaintiffs' motion for a preliminary injunction at a hearing held on December 5, 2023. For the reasons that follow, the Court grants Plaintiffs' motion in part

and denies it in part.  In particular, based on the evidence presented, the Court finds that injunctive relief is appropriate with respect to the alleged trade dress, and otherwise denies the motion.  As indicated below, however, the denial of other injunctive relief at this stage does not mean that Plaintiffs may not, after a more fully developed record, be able to establish their entitlement to broader relief.

## I.  Background

### A.    Findings of Fact[1]

This case has an extensive factual record and involves a web of implicated corporate entities.  The Court will only train on the parts of the record most relevant to the preliminary injunction motion.

In 1981, brothers Gino and Fernando Masci opened the first Il Mulino restaurant at 86 West Third Street in the Greenwich Village neighborhood of Manhattan.  Dkt. 67 ("Katzoff Decl.") ¶¶ 1-2; Dkt. 26 ("Galligan Decl.") ¶ 4.  The Masci brothers owned this restaurant through Defendant GFB Restaurant Corp. ("GFB").  Galligan Decl. ¶ 4; *see also* Katzoff Decl. ¶ 2.  The restaurant proved very successful and was "rated the number one Italian restaurant in New York City by Zagat Survey for twenty . . . years."  Katzoff Decl. ¶ 3.  Katzoff and Brian Galligan—both of whom were extensively involved in the development of the Il Mulino brand in later years— attributed the restaurant's success in large part to its high-end Italian cuisine, which featured several signature or proprietary recipes.  Katzoff Decl. ¶ 9; Galligan Decl. ¶¶ 5-7.

---

[1] "In deciding a motion for preliminary injunction, a court may consider the entire record including affidavits and other hearsay evidence."  *J.T. v. de Blasio*, 500 F. Supp. 3d 137, 181 (S.D.N.Y. 2020) (internal quotation marks omitted).  The Court accordingly considers the parties' declarations, as well as other materials submitted at the December 5, 2023 hearing.

At some point in the early 2000s, Katzoff and Galligan formed Defendant IM LLC-1 ("IM-1"); this entity came to be "the beneficial owner of all intellectual property" related to the original Il Mulino. Galligan Decl. ¶ 10; *see* Katzoff Decl. ¶ 6. According to Katzoff, IM-1 entered into a license agreement with GFB in September 2002, through which the former licensed Il Mulino-related intellectual property for GFB to use "in connection with the [o]riginal Il Mulino [l]ocation." Katzoff Decl. ¶ 8. In 2004, IM LLC-III ("IM-3") was formed "to raise additional capital for further expansion." *Id.* ¶ 20; *see* Galligan Decl. ¶ 11. IM-1 licensed Il Mulino-related intellectual property to IM-3 the same year; IM-3 then proceed to assign its rights and interest in this license to an entity called Il Mulino USA ("IM USA"). Galligan Decl. ¶¶ 12-13; Katzoff Decl. ¶¶ 22-23. Through the license, IM-1 granted IM-3 "an exclusive, except for [certain] licenses[,] . . . royalty-free right and license to use the Intellectual Property" for a term of 20 years; this intellectual property included, most relevantly for purposes of this Opinion, "trade dress," "recipes," and "trademarks (common law and registered)." Dkt. 26-1 ("IM-3 IP License") §§ 1.1, 6.1; *id.* at 1. Under this license, IM-1 also undertook an obligation to "apply to register the marks IL MULINO and IL MULINO NEW YORK with the U.S. Patent & Trademark Office," *id.* § 3.2; these marks appear to be registered under U.S. Registration Numbers 2923240 and 2889810, respectively (collectively, the "Il Mulino Marks"). *See* Dkt. 13; Trademark States & Document Retrieval, United States Patent and Trademark Office, https://tsdr.uspto.gov/ (search for Registration Numbers 2923240 and 2889810) (last visited Jan. 14, 2024).

A number of Il Mulino-related restaurants were opened under the auspices of this licensing structure in the 2000s and 2010s. Galligan Decl. ¶ 16; Katzoff Decl. ¶¶ 24, 26-31. Galligan declared that "every new Il Mulino-branded restaurant obtained rights to use Il Mulino IP through a sublicense from IM USA or one of its subsidiaries." Galligan Decl. ¶ 17. Most importantly for

present purposes, Defendant IMNY GS was formed in 2017 to open what would become Il Mulino Tribeca in 2018. *Id.* ¶ 20; *see* Katzoff Decl. ¶ 68.  Much like the other newer Il Mulino restaurants, "IMNY GS obtained a sublicense from IM USA to use the Il Mulino IP, including the Il Mulino [r]ecipes, in connection with the operation of Il Mulino Tribeca."  Galligan Decl. ¶ 22.  Galligan also declared that "IMNY GS spent more than $240,000 to acquire unique décor, fixtures, artwork, and tableware for use at Il Mulino Tribeca" (collectively, the "Il Mulino Tribeca Personal Property") and that "the restaurant space for Il Mulino Tribeca was designed to include several unique elements" (the "Il Mulino Tribeca Trade Dress" or the "Trade Dress").  *Id.* ¶¶ 23-24.  The Il Mulino Tribeca Trade Dress is described and discussed at length below.  *See infra* III.A.1.

According to Katzoff and Galligan, Il Mulino Tribeca struggled financially at the very least after the onset of the COVID-19 pandemic, although the two appear to disagree about the underlying cause of the restaurant's financial condition.  Galligan Decl. ¶ 33; Katzoff Decl. ¶¶ 44-45, 48.  In any case, IM USA and several other entities—including IM-3—filed a voluntary bankruptcy petition in the United States Bankruptcy Court for the Southern District of New York in July 2020.  *In re KG Winddown, LLC, et al.*, No. 20-11723-mg (S.D.N.Y. Bankr.), Dkt. 1 at 6; *see* Katzoff Decl. ¶ 59; Galligan Decl. ¶ 34.  Later that year, BSP Agency LLC—an entity that had entered into a credit agreement with IM-3 and IM USA, among other parties, in 2015—bought "substantially all of the [b]ankruptcy [p]arties' assets under an asset purchase agreement."  Katzoff Decl. ¶¶ 34-36, 61.  Richard Shinder—a member of the board of managers of an entity that, in one form or another, functionally controls Plaintiffs—declared that these assets, including the Il

Mulino-related intellectual property interest held by IM USA, was transferred to Plaintiffs as a result of the bankruptcy sale. Dkt. 27 ("Shinder Decl.") ¶ 6.[2]

Per Katzoff, Il Mulino Tribeca reopened after the pandemic in early 2022. Katzoff Decl. ¶ 82. The restaurant continued to face financial difficulties, however, which Shinder attributed to Katzoff's "poor management." Shinder Decl. ¶ 12. *But see* Katzoff Decl. ¶ 83 (attributing these difficulties to "slow" business). The response to these difficulties is a source of much contention between the parties. Katzoff declared that the restaurant fell behind on rent in early 2023 but BSP Agency refused to provide more funding for the restaurant, leaving him with essentially no choice but to close Il Mulino Tribeca. Katzoff Decl. ¶¶ 98-99. In late March 2023, Katzoff wrote to BSP Agency about his intention to "open a new restaurant, with different ownership, in the [same] location once a new liquor license was obtained." *Id.* ¶ 100. Shinder declared that once Plaintiffs "became aware" of Katzoff's plans, he sent a letter to Katzoff to warn him against using the Il Mulino's intellectual property that was sold as part of the bankruptcy sale, "[b]ecause of concerns caused by Mr. Katzoff's prior self-dealing and attempts to use the Il Mulino IP without valid rights." Shinder Decl. ¶ 15. Shinder also declared that Katzoff responded that "[a] deal is being made with the land lord [sic] to take back the restaurant and all its assets for the satisfaction of the back rent owed and a new tenant will take over the space at the time of the issuance of the new license," which Shinder took to mean both that "Mr. Katzoff recognized he did not have any rights to use the Il Mulino IP at a new restaurant under his ownership after Il Mulino Tribeca closed" and that Katzoff would "transfer Il Mulino Tribeca's personal property . . . to IMNY GS'[s] creditors."

---

[2] Judge Glenn described Plaintiffs Asset Co IM Rest and Receivables IM Rest as "BSP entities" in an opinion related to this sale, *In re KG Winddown*, 632 B.R. at 458 n.2; Katzoff also describes Plaintiffs as "directly controlled by BSP [Agency]," Katzoff Decl. ¶ 67. BSP Agency "took over a 55% ownership interest in IMNY GS and the Il Mulino Tribeca restaurant." *Id.* ¶ 70; *see also* Motion at 8.

*Id.* ¶¶ 17-18; *see also* Motion at 10 ("Given Katzoff's . . . response [to Shinder], Plaintiffs were surprised to learn in August 2023 that the 'new tenant' might be Katzoff himself." (citing Shinder Decl. ¶ 19)).  The parties more generally contest the extent to which Katzoff made Plaintiffs aware of his plans for the new restaurant, but these disputes are of no real moment for purposes of the preliminary injunction motion.  *Compare* Dkt. 51 ("Opposition") at 14-15 *with* Dkt. 53 ("Shinder Reply Decl.") ¶¶ 4-14.

Il Mulino Tribeca closed on September 5 or 6, 2023.  Katzoff Decl. ¶ 105.  According to Shinder, on August 31 and September 15, 2023, "Plaintiffs sent two demand letters to Defendants objecting to any use of the Il Mulino IP or Il Mulino Tribeca's personal property at [the] planned restaurant."  Shinder Decl. ¶ 20.  Il Giglio opened at the same location, 361 Greenwich Street, on September 15, 2023.  Katzoff Decl. ¶ 108.  The new restaurant shares a name with a former restaurant in Tribeca that Galligan declared was run by relatives of the Masci brothers "pursuant to [the brothers' permission]," Galligan Decl. at 3 n.1; Plaintiffs repeatedly refer to this prior restaurant as a "sister restaurant" to Il Mulino, *e.g.*, Dkt. 1 ("Compl.") ¶¶ 9, 34, 96; Dkt. 25 ("Motion") at 3, 11, 18.  The similarities and differences between Il Mulino Tribeca and the new Il Giglio are described extensively below and are the central focus of this Opinion.

## B.    Procedural History

Plaintiffs filed this action on November 2, 2023, bringing causes of action under federal law for unfair competition, false designation of origin, and trademark infringement under the Lanham Act, in addition to causes of action for infringement of the intellectual property licensed in the licenses described above, breach of license, common law unfair competition, conversion, unjust enrichment, and voidable transaction under New York Debtor and Creditor Law.  Compl.

¶¶ 158-292.[3]   They filed the instant motion for a preliminary injunction on November 5, 2023.

Dkts. 23, 25-28.   Defendants filed their opposition on November 22, 2023, Dkts. 51, 66-67, and

Plaintiffs filed their reply on November 29, 2023, Dkts. 52 ("Reinhard Reply Decl."), 53, 54

("Reply").   The Court held a hearing on the motion on December 5, 2023.   Dkt. 68 ("Tr."); *see*

Dkt. 30.   As noted below, *see infra* III.A.3, the parties declined the Court's invitation to call

witnesses at this hearing.

## II.  Standard of Review

"[A] preliminary injunction is an extraordinary remedy never awarded as of right." *Benisek*

*v. Lamone*, 138 S. Ct. 1942, 1943 (2018) (internal quotation marks omitted).   "A party seeking a

preliminary injunction must show (1) irreparable harm; (2) either a likelihood of success on the

merits or both serious questions on the merits and a balance of hardships decidedly favoring the

moving party; and (3) that a preliminary injunction is in the public interest."   *N. Am. Soccer*

*League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018).

The parties dispute whether the Court should review Plaintiffs' motion under the

prohibitory injunction standard—described immediately above—or under the "heightened legal

standard" for mandatory injunctions, which requires a "showing [of] a clear or substantial

likelihood of success on the merits."   *Id.* (internal quotation marks omitted).   Simply put,

"[p]rohibitory injunctions maintain the status quo pending resolution of the case; mandatory

injunctions alter it."   *Id.* at 36.   The same heightened standard also applies "where the injunction

being sought will provide the movant with substantially all the relief sought and that relief cannot

---

[3] These causes of action are brought by different Plaintiffs against different Defendants,
but the distinctions are of no moment for purposes of the instant motion.   After all, any injunction
under Federal Rule of Civil Procedure 65 would bind the parties and "other persons who are in
active concert or participation" with them.   Fed. R. Civ. P. 65(d)(2).

be undone even if the defendant prevails at a trial on the merits." *Yang v. Kosinski*, 960 F.3d 119, 127-28 (2d Cir. 2020) (internal quotation marks omitted).

Defendants claim that "Plaintiffs seek to change the status quo of the parties by forcing West Third Holdings to change the name of the Restaurant and remove certain portions of its décor, which clearly would alter the status quo." Opposition at 16. As Plaintiffs point out, Reply at 3, Defendants appear to misunderstand what constitutes the status quo for purposes of a preliminary injunction. The Second Circuit has held that "the status quo to be preserved by a preliminary injunction is the last actual, peaceable uncontested status which preceded the pending controversy." *Mastrio v. Sebelius*, 768 F.3d 116, 120 (2d Cir. 2014) (cleaned up). And, somewhat paradoxically, "[p]reserving the status quo is not confined to ordering the parties to do nothing: it may require parties to take action." *Id.* at 120-21; *see Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 454 F.3d 108, 114 (2d Cir. 2006) ("The distinction between mandatory and prohibitory injunctions is not without ambiguities or critics." (internal quotation marks omitted)). In other words, the fact that Plaintiffs' proposed injunction could require Defendants to take some affirmative act does not automatically render the injunction mandatory. And, generally speaking, "[a]n injunction to restrain the use of a trademark is prohibitory." *Colony Grill Dev., LLC v. Colony Grill, Inc.*, No. 21-2136, 2022 WL 950950, at *2 (2d Cir. Mar. 30, 2022) (citing *Louis Vuitton Malletier*, 454 F.3d at 114 ("A prohibitory injunction is one that forbids or restrains an act. For example, in the typical trademark case a prohibitory injunction seeks to stop alleged infringement.") (internal quotation marks omitted))). This logic also comports with the fact that the last uncontested status preceding this case was prior to Il Giglio's opening. Indeed, as evidenced by the April 2023 correspondence, the controversy over Il Mulino Tribeca's successor restaurant began months before its opening. Therefore, while Plaintiffs' proposed injunction

certainly would appear to require Defendants to take affirmative acts, the injunction is still prohibitory under *Mastrio*.

### III. Discussion

As Defendants pointed out during the Court's hearing on the instant motion, Plaintiffs' briefing is at times not a model of clarity with respect to the specific injunctive relief sought. Nevertheless, the Court discerns four principal forms of requested relief: that Defendants stop using (1) the Il Mulino Tribeca Trade Dress, (2) Il Mulino proprietary recipes, (3) the Il Mulino Tribeca Personal Property and (4) the names Il Giglio or Il Giglio Tribeca. *See, e.g.*, Motion at 25. The Court assesses Plaintiffs' motion through the lens of likelihood of success on their Lanham Act unfair competition, false designation of origin, and trademark infringement claims. While Plaintiffs also bring unfair competition claims under New York common law, "[a] party that fails to prevail on its Lanham Act claims thus cannot prevail on New York common law claims for infringement and unfair competition." *Now-Casting Econs., Ltd. v. Economic Alchemy LLC*, 628 F. Supp. 3d 501, 517 (S.D.N.Y. 2022) (citation omitted).[4]

---

[4] On a related note, Plaintiffs purport to "reserve the right to argue that they are likely to succeed on any of their claims," Motion at 12 n.9, citing the proposition that they "need not show that there is a likelihood of success on the merits of all of their claims for relief[;] [r]ather, [they] must show a likelihood of success on the merits of at least one of their claims." *Reyes v. City of New York*, No. 23 Civ. 6369 (JGLC), 2023 WL 7212192, at *5 (S.D.N.Y. Nov. 2, 2023) (internal quotation marks omitted). But the Court cannot discern arguments related to Plaintiffs' other claims, apart from barebones, footnoted arguments about their likelihood of success on their breach of contract and breach of fiduciary duty claims. *See* Motion at 22 nn.16-17. The Court accordingly declines to reach them in this Opinion. "[T]here is no basis in law for a party to reserve issues that it could have argued but did not. On the contrary, counsel's failure to timely raise and fully address an issue ordinarily forfeits a party's right to have that issue decided by the court." *Royal & Sun All. Ins. PLC v. UPS Supply Chain Sols., Inc.*, No. 16 Civ. 9791 (NRB), 2018 WL 1888483, at *3 (S.D.N.Y. Apr. 5, 2018) (internal quotation marks omitted). And, as to the footnoted arguments, "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *Tolbert v. Queens Coll.*, 242 F.3d 58, 75 (2d Cir. 2001) (internal quotation marks omitted). Therefore, for purposes of resolving the instant motion for a

## A.      Likelihood of Success

Section 43(a)(1)(A) of the Lanham Act penalizes the use in commerce of "any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which . . . (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person."  15 U.S.C. § 1125(a)(1).

A plaintiff alleging trademark infringement or unfair competition under the Lanham Act "must demonstrate that (1) it has a valid mark that is entitled to protection and that (2) the defendant's actions are likely to cause confusion with that mark." *Tiffany & Co. v. Costco Wholesale Corp.*, 971 F.3d 74, 84 (2d Cir. 2020) (internal quotation marks and alteration omitted); *see also Jackpocket, Inc. v. Lottomatrix NY LLC*, 645 F. Supp. 3d 185, 228 (S.D.N.Y. 2022) ("The standards governing claims for unfair competition, under Section 43(a) of the Lanham Act, and for trademark infringement, under Section 32, are substantially the same.").  "[A] plaintiff must prove a probability of confusion affecting numerous ordinary prudent purchasers." *Tiffany & Co.*, 971 F.3d at 84 (internal quotation marks and alteration omitted).  As discussed further below, in the context of a trade dress-related claim, a plaintiff must also "offer a precise expression of the character and scope of the claimed trade dress" and show that "the claimed trade dress is non-functional." *Sherwood 48 Assocs. v. Sony Corp. of Am.*, 76 F. App'x 389, 391 (2d Cir. 2003) (internal quotation marks omitted).

---

preliminary injunction, the Court considers Plaintiffs' likelihood of success on only their Lanham Act claims.

1.      **Il Mulino Tribeca Trade Dress**

The Court first turns to the Il Mulino Tribeca Trade Dress.  Plaintiffs define the Il Mulino

Tribeca Trade Dress as being comprised of the following "distinctive and recognizable elements":

> (1) an art collection of black and white photographs arranged in a perfectly
> symmetrical design, covering almost one entire interior wall of the restaurant; (2)
> custom artwork commissioned for Il Mulino Tribeca's back wall that evokes the
> restaurant's Tribeca home by referring to its location "Below Canal St[reet]"; (3)
> white-washed brick and high ceilings painted matte black; and (4) unique, hand-
> blown glass pendants hanging near the entrance of the restaurant.

Compl. ¶ 60; Motion at 14.

a.      **Valid and Protectible Trade Dress**

In order to show that the Il Mulino Tribeca Trade Dress is valid and protectible, Plaintiffs

must show that it is "not functional" and that it is "either inherently distinctive or has acquired

secondary meaning in the marketplace."  *Capri Sun GmbH v. Am. Beverage Corp.*, 595 F. Supp.

3d 83, 187 (S.D.N.Y. 2022) (cleaned up) (internal quotation marks omitted).  Plaintiffs conceded

during the hearing on the motion that they proceed under an inherently distinctive argument, *see*

Tr. at 21:24-22:1, and the Court accordingly assesses the protectability of the Il Mulino Tribeca

Trade Dress under that theory.[5]

The Court ultimately concludes that Plaintiffs are likely to succeed in showing that the Il

Mulino Tribeca Trade Dress is valid and protectable.  First—despite Defendants' contention that

Plaintiffs hinge their allege trade dress "on broad and vague terms," Opposition at 20—Plaintiffs

have defined the Il Mulino Tribeca Trade Dress's character and scope with sufficient precision.

---

[5] To be sure, Plaintiffs also put forward a secondary meaning argument during the
December 5, 2023 hearing, but "the Court will not consider arguments raised for the first time in
a reply brief, let alone at or after oral argument."  *Nobel Ins. Co. v. City of New York*, No. 00 Civ.
1328 (KMK), 2006 WL 2848121, at *16 (S.D.N.Y. Sept. 29, 2006) (internal quotation marks and
alterations omitted).

The alleged Trade Dress fits comfortably within the range of examples approved in prior case law. In *Best Cellars, Inc. v. Wine Made Sample, Inc.*, for example, a court in this District found a wine store's interior design to constitute distinctive trade dress when the plaintiff alleged that the trade dress was comprised of, *inter alia*, "single display bottles set on stainless-steel wire pedestals" and "square 4"×4" cards with verbal descriptions of each wine . . . with text arranged by template." 320 F. Supp. 2d 60, 70-71 (S.D.N.Y. 2003).   The Supreme Court similarly "assume[d] without deciding" that restaurant trade dress comprising, *inter alia*, "a festive eating atmosphere having interior dining and patio areas decorated with artifacts, bright colors, paintings and murals" was inherently distinctive. *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 765, 770 (1992).  Here, Plaintiffs' detailed description of the aspects of the restaurant's interior that collectively comprise the Il Mulino Tribeca Trade Dress—as exemplified through pictures of aspects of the alleged Trade Dress, *see* Galligan Decl. ¶¶ 25, 28—sufficiently describes the parameters of the trade dress.  To be sure, certain aspects of the Il Mulino Tribeca Trade Dress—in particular the "white-washed brick and high ceilings painted matte black"—could be found at any number of restaurants.  But the mere fact that some individual elements of the alleged trade dress are generic does not negate the fact that Plaintiffs have adequately specified the contours of the Il Mulino Tribeca Trade Dress. *See Best Cellars*, 320 F. Supp. 2d at 71 ("[S]imply because certain elements are used in other wine shops, such as storing wine horizontally in racks or presenting one display bottle per wine does not mean that those elements must be removed from the overall impression because they are 'generic.'"); *cf. Landscape Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373, 381 (2d Cir. 1997) ("[The] focus on the *overall look* of a product does not permit a plaintiff to dispense with an articulation of the specific elements which comprise its distinct dress." (emphasis added)).

In addition, to the extent that Defendants meant their argument to concern functionality, "[e]ven if individual elements of a trade dress are functional, their arrangement or combination may . . . deserve trade dress protection." *Coach, Inc. v. We Care Trading Co.*, 67 F. App'x 626, 629 (2d Cir. 2002). The Court does not hesitate to conclude that the Il Mulino Tribeca Trade Dress is non-functional. The functionality analysis primarily trains on whether the trade dress "is essential to the use or purpose of the article or if it affects the cost or quality of the article." *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 116 (2d Cir. 2001). Il Mulino Tribeca's décor plainly does not affect a customer's "use or purpose" of the restaurant nor the cost or quality thereof. A customer could just as easily enjoy veal parmigiana in the absence of glass pendants or white-washed brick. *Cf. Tex. Chicken & Burgers, LLC v. NYQ Prop., LLC*, No. 17 Civ. 976 (ERK) (CLP), 2018 WL 6718843, at *5 (E.D.N.Y. Nov. 1, 2018) (noting in the context of restaurant décor that "taken together, the colors, the clear windows with images of food along the base, and the illuminated signs that display the names and pictures of the menu items are not 'essential to the use of or purpose of the article'" (quoting *Qualitex Co. v. Jacobson Prods. Co., Inc.*, 514 U.S. 159, 165 (1995))). And while "exclusive use" of some commonly used features, such as the black matte ceiling or white-washed brick, could "put competitors at a significant non-reputation-related disadvantage," *Qualitex Co.*, 514 U.S. at 165, the trade dress inquiry focuses on the trade dress as a whole, not on individual elements thereof. *Cf. Maharishi Hardy Blechman Ltd. v. Abercrombie & Fitch Co.*, 292 F. Supp. 2d 535, 543 (S.D.N.Y. 2003) ("Where the asserted trade dress extends to the 'overall look' of the combination of features comprising a product or product line, the Court must evaluate the distinctiveness and functionality of those features *taken together*, not in isolation."). Had the new Il Giglio featured only black matte ceilings, for instance, Plaintiffs would be very hard pressed to show a likelihood of success on a valid and protectable trade dress. In

other words, any risk of allowing Plaintiffs to monopolize generic features of the alleged Trade Dress is mitigated by the fact that only the Trade Dress as a whole is protectable, not necessarily the individual elements thereof.[6]

Finally, and perhaps most importantly, the Court also concludes that the Il Mulino Tribeca Trade Dress is inherently distinctive. "To describe different degrees of inherent distinctiveness, the trademark law utilizes four categories[:] . . . (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful." *RiseandShine Corp. v. PepsiCo, Inc.*, 41 F.4th 112, 120 (2d Cir. 2022). "Suggestive, arbitrary, or fanciful trade dress is considered inherently distinctive and thus protectable unless it is also functional." *Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 164 F.3d 736, 743 (2d Cir. 1998). "The focus of the distinctiveness inquiry, and the ultimate test of protectability under the Lanham Act, is whether the plaintiff's trade dress is capable of distinguishing the plaintiff's goods from those of others." *Id.*

Plaintiffs aver that their trade dress is arbitrary. Motion at 16.; *see Tex. Chicken & Burgers*, 2018 WL 6718843, at *6 ("Upon examining the photographs provided by plaintiff, the Court finds

---

[6] Defendants also claim that Plaintiffs have not used the Il Mulino Tribeca Trade Dress in commerce because "no Il Mulino restaurant has the same interior design and each is unique." Opposition at 17. This argument ignores the fact that the alleged Trade Dress is specific to the former Il Mulino Tribeca location, not to all restaurants with the Il Mulino brand. Nor does the Court take this argument to mean that Defendants contest the fact that the Il Mulino Tribeca Trade Dress was used in commerce prior to the closure of said restaurant; any such argument would be clearly meritless, as evidenced by, among other things, social media advertisements for the restaurant that showcased elements of the Trade Dress. *See* Galligan Decl., Exh. G; 15 U.S.C. § 1127 ("[A] mark shall be deemed to be in use in commerce . . . on services when it is used or displayed in the sale or advertising of services and the services are rendered in commerce . . . ."). Defendants also have not asserted that Plaintiffs have abandoned the Il Mulino Tribeca Trade Dress. *See ITC Ltd. v. Punchgini, Inc.*, 482 F.3d 135, 147 (2d Cir. 2007) ("If, however, an owner ceases to use a mark without an intent to resume use in the reasonably foreseeable future, the mark is said to have been abandoned. Once abandoned, a mark returns to the public domain and may, in principle, be appropriated for use by other actors in the marketplace, in accordance with the basic rules of trademark priority . . . ." (internal quotation marks omitted)).

that the colors, images, and décor used by plaintiff and described above are inherently distinctive in that the composite result is an arbitrary total visual image to consumers." (internal quotation marks omitted)); *Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*, 813 F. Supp. 2d 489, 540 (S.D.N.Y. 2011) (finding that a gym's trade dress was inherently distinctive in part because "[t]he Pure Power facility is clearly unlike traditional exercise facilities, which tend to have standard workout equipment arranged in a linear fashion with a utilitarian appearance"); *Best Cellars*, 320 F. Supp. 2d at 71 (noting that a wine store's interior décor was inherently distinctive because it "exhibit[s] a clean, crisp modern design characterized by wood and steel[;] [i]t is . . . essentially undisputed that certain elements of the Best Cellars trade dress are arbitrary and/or uncommon for wine shops").  After reviewing the evidence presented at the hearing, the Court determines that Plaintiffs have shown a likelihood of establishing that the trade dress is at the very least suggestive.

"Suggestive marks suggest (rather than directly describe) the product on which they are employed, or its attributes, sometimes requiring imagination to grasp the linkage," whereas "[a]rbitrary and fanciful marks . . . make no logical reference to the product or service on which they are used." *RiseandShine Corp.*, 41 F.4th at 121.  Plaintiffs themselves do not appear to be entirely consistent with their own descriptions of the Il Mulino Tribeca Trade Dress, insisting on one hand that the former Il Mulino Tribeca had "high-end décor[] and artwork"—in line with their description of the restaurant as offering "high-end Italian restaurant services," Compl. ¶¶ 8, 171—but also that the proffered "[t]rade [d]ress is arbitrary, in that it 'does not communicate any information about [the] restaurant[]," Motion at 16-17 (quoting *Museum of Modern Art v. MOMACHA IP LLC*, 339 F. Supp. 3d 361, 374 (S.D.N.Y. 2018)).  Press reviews would appear to indicate that at least some members of the public (albeit perhaps an especially discerning portion

thereof) drew a connection between Il Mulino Tribeca's décor and its upscale culinary offerings. One article described the restaurant as mirroring "the contemporary cosmopolitan feel of downtown Manhattan," Dkt. 28 ("Reinhard Decl."), Exh. Q-1, while another reported that the restaurant's "warm light [and] lime-washed bricks . . . create the perfect nod to [Tribeca's] industrial past and refined present" and highlighted the "wall of black and white photography pulling famous Tribeca scenes, notorious New Yorkers and iconic images of this beloved area of downtown," *id.*, Exh. Q-2. These connections are not as evident to the Court, although the "below Canal St[reet]" artwork clearly draws on the restaurant's geographic location, *see, e.g.*, Galligan Decl. ¶ 28. Indeed, part of the challenge with the alleged scope of the Il Mulino Tribeca Trade Dress is that many of the more obviously high-end aspects of the restaurant's décor, such as the white tablecloths, silver cutlery, and sleek, grey chairs, do not form part of the proffered Trade Dress, *see, e.g.*, Galligan Decl., Exh. G, and "courts must ultimately 'look[] at all [the trade dress's] *elements* and consider[] the total impression the trade dress gives to the observer'" in undertaking the distinctiveness analysis. *Capri Sun*, 595 F. Supp. 3d at 189 n.53 (emphasis added) (quoting *Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.*, 111 F.3d 993, 1001 (2d Cir. 1997)). To be sure, some elements of the Trade Dress appear to be arbitrary: the glass pendants, for instance, may well have been an expensive purchase, but the Court would hesitate to call them upscale or otherwise obviously connected to Italian cuisine; the Court can discern no logical reference to either. *See* Reinhard Decl., Exh. W. But the Court need not tarry further. Whether suggestive or arbitrary, Plaintiffs have shown a likelihood of establishing that the Il Mulino Tribeca Trade Dress is inherently distinctive.

Given these factors, the Court determines that Plaintiffs are likely to succeed in showing that the Il Mulino Tribeca Trade Dress is valid and protectable.[7]

### b. Likelihood of Confusion

Having concluded that the Il Mulino Tribeca Trade Dress is valid and protectable, the Court turns to likelihood of confusion. "To prevail in a federal trademark infringement claim, a plaintiff must demonstrate that the defendant's actions are likely to cause confusion with that mark." *RiseandShine Corp.*, 41 F.4th at 119 (internal quotation marks and alterations omitted). "In order to be confused, a consumer need not believe that the owner of the mark actually produced the item and placed it on the market." *Star Indus., Inc. v. Bacardi & Co.*, 412 F.3d 373, 383-84 (2d Cir. 2005) (internal quotation marks omitted). "The public's belief that the mark's owner sponsored or otherwise approved the use of the trademark satisfies the confusion requirement." *Id.* (internal quotation marks omitted); *see also Barefoot Contessa Pantry, LLC v. Aqua Star (USA) Co.*, No. 15 Civ. 1092 (JMF), 2015 WL 845711, at *3 (S.D.N.Y. Feb. 26, 2015) ("In order to establish a valid Lanham Act claim based on trademark or trade dress infringement, a party must show . . . that defendant's use of the trademark or trade dress is likely to cause consumer confusion as to the origin, affiliation or association, or endorsement of defendant's goods or services."). Courts in the Second Circuit analyze the following eight factors enumerated in *Polaroid Corp. v. Polarad Electronics Corp.* in assessing consumer confusion:

> [T]he strength of [the plaintiff's] mark, the degree of similarity between the two marks, the proximity of the products, the likelihood that the [plaintiff] will bridge the gap, actual confusion, and the reciprocal of defendant's good faith in adopting

---

[7] Plaintiffs also argued principally in their reply brief that at least some of the Defendants should be estopped from contesting the protectability of the Il Mulino Tribeca Trade Dress because of several Il Mulino intellectual property-related contracts. *See* Reply at 4. The Court need not address this issue at this stage in light of the conclusion that Plaintiffs are likely to show that the Il Mulino Tribeca Trade Dress is protectable as a matter of law.

its own mark, the quality of defendant's product, and the sophistication of the buyers.

287 F.2d 492, 495 (2d Cir. 1961).  "The evaluation of the *Polaroid* factors is not a mechanical process where the party with the greatest number of factors weighing in its favor wins." *Tiffany & Co.*, 971 F.3d at 85 (internal quotation marks omitted).  "Rather, a court should focus on the ultimate question of whether consumers are likely to be confused." *Id.* (internal quotation marks omitted).

On a preliminary note, Plaintiffs—pointing to Defendant IMNY GS's previous license to use the Il Mulino Tribeca Trade Dress through the Il Mulino Tribeca sublicense—claim that "where a defendant previously made authorized use of a mark or other source identifier(s) and continues making use without authorization, it will cause confusion as a matter of law and the Court need not apply the traditional eight-factor *Polaroid* test."  Motion at 15; *accord Fischer v. Forrest*, 286 F. Supp. 3d 590, 616 (S.D.N.Y. 2018) ("Courts in this district have indeed held that when an ex-licensee continues to use a mark after its license expires, likelihood of confusion is established as a matter of law." (internal quotation marks and alterations omitted)).  While Defendants contest this claim, the parties' dispute need not detain the Court.  Even applying the *Polaroid* test, Plaintiffs are likely to succeed in showing that Defendants' actions are likely to cause confusion with the Il Mulino Tribeca Trade Dress.

### i.    Strength of the Trade Dress

"The strength of a trademark is assessed based on either or both of two components: (1) the degree to which it is inherently distinctive; and (2) the degree to which it has achieved public recognition in the marketplace, sometimes called acquired strength." *RiseandShine*, 41 F.4th at 120 (internal quotation marks omitted).  As discussed above, the Court has already determined that the Il Mulino Tribeca Trade Dress is at least suggestive.  But a suggestive mark is not necessarily

18

a strong one.  "If the suggestion conveyed by a suggestive mark conjures up an essential or important aspect of the product, while the description conveyed by a descriptive mark refers to a relatively trivial or insignificant aspect of the product, the particular suggestive mark could be deemed weaker than the descriptive."  *RiseandShine Corp.*, 41 F.4th at 122.  Here, as noted above, the most suggestive aspect of the trade dress is the custom artwork that appears to refer to Il Mulino Tribeca's location "below Canal St[reet]."  *See* Compl. ¶ 62.  But the former restaurant's location is not necessarily "an essential or important aspect of the product."  It is true that Il Mulino Tribeca's location helped differentiate it from other Il Mulino restaurants, as evidenced by some of the press articles highlighted above.  *See, e.g.*, Reinhard Decl., Exh. Q-1 (describing Il Mulino Tribeca as "[a] Florentine café with the contemporary cosmopolitan feel of downtown Manhattan").  However, Il Mulino Tribeca fundamentally offered "high-end Italian restaurant services," Compl. ¶ 171, and the premise's location was in all likelihood ancillary to that business. From that perspective, the Il Mulino Tribeca Trade Dress is on the stronger end of the suggestive scale; it is certainly stronger than, for instance, the "Rise" design mark for energy drinks at issue in *RiseandShine*.  *See* 41 F.4th at 122 ("Coffee's capacity to wake one up and lift one's energy, which is what the 'RISE' mark suggests, is such an important part of the perceived virtue of coffee in the eyes of the consuming public as to render this suggestive mark decidedly weak.").

However, the Il Mulino Tribeca Trade Dress fares worse with the public recognition prong. To be sure, and as highlighted above, Plaintiffs have proffered several restaurant reviews and articles that mention the former Il Mulino Tribeca's décor or general ambiance.  *See* Reinhard Decl., Exhs. P-3 ("Il Mulino Tribeca is a modern classic—a modern ambiance with a classic menu."), Q-1 ("A Florentine café with the contemporary cosmopolitan feel of downtown Manhattan . . . ."), Q-2 ("An intermix of warm light, lime-washed bricks, industrial chrome,

mirrors and grey leather create the perfect nod to the area's industrial past and refined present . . . .

The airy dining room features a wall of black and white photography pulling together famous

Tribeca scenes, notorious New Yorkers and iconic images of this beloved area of downtown."').

Plaintiffs have also provided several Il Mulino advertisements showcasing the Il Mulino Tribeca

Trade Dress.  *See* Reinhard Reply Decl., Exhs. UU-1, VV-1, YY-1, ZZ-1, ZZ-2.  "Advertising

expenditures provide circumstantial evidence of the possible effect that advertising of the

trademark or service mark may have on consumers' association of it with the source of a product

or service."  *Jackpocket*, 645 F. Supp. 3d at 246 (internal quotation marks omitted).  Yet "the

relevant factor is not the amount of advertising itself but rather that the advertising was 'effective

in causing the relevant group of consumers to associate [the mark] with' its source."  *Id.* (quoting

*Centaur Commc'ns, Ltd. v. A/S/M Commc'ns, Inc.*, 830 F.2d 1217, 1222 (2d Cir. 1987), *overruled

on other grounds as recognized by Erchonia Corp. v. Bissoon*, 410 F. App'x 416, 418 (2d Cir.

2011)).  The Court is not particularly persuaded that the advertising has led consumers to associate

the Trade Dress with Il Mulino Tribeca.  After all, only one of the press articles or reviews

highlighted above specifically referred to the Il Mulino Tribeca Trade Dress, and the others'

generic references to the restaurant's "ambiance" or "feel" do not suffice to show public

recognition of the Trade Dress.  Indeed, and perhaps not surprisingly, the majority of these reviews

seem to focus instead on the food.  *Cf. Best Cellars*, 320 F. Supp. 2d at 74-75 (noting that a wine

store's interior design did not necessarily achieve public recognition when "the publicity in the

general media that plaintiff has received appears to focus on, and identify Best Cellars with, the

unprotectable marketing theme of selling wine by taste category rather than the overall physical

design of the stores").  This evidence leads to the conclusion that the Il Mulino Tribeca Trade

Dress's acquired strength is fairly weak.

Given the conclusions that the Il Mulino Tribeca Trade Dress is inherently distinct yet not particularly publicly recognizable, the Court determines that this factor at best weighs only mildly in Plaintiffs' favor.

### ii.     Similarity of the Trade Dress

When evaluating the similarity of marks, "courts look to the overall impression created by the marks and the context in which they are found." *Car-Freshner Corp. v. Am. Covers, LLC*, 980 F.3d 314, 331 (2d Cir. 2020) (internal quotation marks omitted).  Defendants conceded at the hearing that Il Giglio did retain certain elements of and equipment from Il Mulino Tribeca.  Indeed, evidence in the record that Defendants did not directly rebut illustrates that the overall look of the former and current restaurants are remarkably similar.  For instance, it appears as if the "below Canal St[reet]" artwork has simply been replaced by similar-appearing "above Warren St[reet]" artwork, with the styling and color scheme remaining much the same:

**<u>Il Mulino Tribecca</u>**                         **<u>Il Giglio</u>**

Reinhard Reply Decl., Exhs. YY-1, YY-2. The same appears true of the "downtown" artwork:

**<u>Il Mulino Tribecca</u>**　　　　　　　　　　　**<u>Il Giglio</u>**




*Id.*, Exhs. ZZ-1, ZZ-2. The fact that Il Giglio has posted advertisements on social media featuring its interior that appear to be identical to Il Mulino Tribeca advertisements further illustrates the extreme similarity of the décor of the two restaurants:

**<u>Il Mulino Tribecca</u>**　　　　　　　　　　　**<u>Il Giglio</u>**




*Id.*, Exhs. UU-1, UU-2.

**<u>Il Mulino Tribecca</u>**　　　　　　　　　　　**<u>Il Giglio</u>**




*Id.*, Exhs. VV-1, VV-2.  And while defense counsel highlighted at oral argument changes to the chair upholstery at Il Giglio, Tr. at 51:3, the question for similarity is the "overall impression

created by the marks"—which likely cannot be defeated by such a relatively minor detail—and Plaintiffs, as discussed above, do not even include the chairs within the scope of the Il Mulino Tribeca Trade Dress.  In terms of context, a customer would find Il Giglio in the exact same location as the old Il Mulino Tribeca.  *See* Galligan Decl. ¶¶ 20, 40; Compl. ¶ 6.  Given these conclusions, the Court does not hesitate to conclude that the trade dress is extremely similar; this prong thus weighs in Plaintiffs' favor.

### iii.    Proximity of the Products and Bridging the Gap

"The proximity of the products factor 'concerns whether and to what extent the two products compete with each other' and 'look[s] to the nature of the products themselves and the structure of the relevant market.'"  *Jackpocket*, 645 F. Supp. 3d at 258 (quoting *Cadbury Beverages, Inc. v. Cott Corp.*, 73 F.3d 474, 480 (2d Cir. 1996)).  Somewhat relatedly, "'[b]ridging the gap' refers to the likelihood that the senior user will enter the junior user's market in the future, or that consumers will perceive the senior user as likely to do so."  *Star Indus.*, 412 F.3d at 387.

The proximity of the products here is obvious.  As Plaintiffs point out, Il Giglio and the Il Mulino restaurants are all relatively high-end Italian restaurants, at least some of which (in the latter's case) are located in New York City.  Motion at 18.  It is telling that Defendants have not offered any developed rebuttal to that claim; indeed, defense counsel at the very least did not disagree at the preliminary injunction hearing with the notion that the restaurants offer similar products, Tr. at 65:5-10, 21-24.  To be sure, the *Tribeca Citizen* reported in a September 22, 2023 article that "Katzoff is hoping to create a bit of a different vibe" from that of Il Mulino Tribeca at the new restaurant by making the latter "a go-to neighborhood place—less business dinner, more kid friendly, a bit more casual."  Reinhard Decl., Ex. W at 1.  But even the author of that article noted that Il Giglio "[is] still white-tablecloth and still expensive," a comment that only reinforces

the extent to which Il Giglio and the Il Mulino restaurants offered strikingly similar experiences. *Id.* The proximity factor thus weighs in Plaintiffs' favor. Further, "there is really no gap to bridge" under these circumstances, making that factor irrelevant to the *Polaroid* analysis. *Star Indus.*, 412 F.3d at 387.

### iv.     Actual Confusion

While a plaintiff is not required to show actual confusion to make out a Lanham Act claim, "[t]he Second Circuit has made clear the prime importance of actual confusion as a factor" in the likelihood of confusion analysis. *Alzheimer's Disease & Related Disorders Ass'n, Inc. v. Alzheimer's Found. of Am., Inc.*, 307 F. Supp. 3d 260, 293 (S.D.N.Y. 2018); *see also Savin Corp. v. Savin Grp.*, 391 F.3d 439, 459 (2d Cir. 2004) ("There can be no more positive or substantial proof of the likelihood of confusion than proof of actual confusion." (internal quotation marks omitted)), *superseded by statute on unrelated grounds as recognized in Rolex Watch U.S.A., Inc. v. Rolex Deli Corp.*, No. 11 Civ. 9321 (BSJ), 2012 WL 5177517, at *3 n.7 (S.D.N.Y. 2012). A plaintiff can proffer anecdotal evidence in support of actual confusion, although some courts in this District have determined that such "evidence must be more than *de minim[i]s.*" *Medici Classics Prods. LLC v. Medici Grp. LLC*, 590 F. Supp. 2d 548, 556 (S.D.N.Y. 2008) (citation omitted).

Plaintiffs point to several items of evidence in support of their assertion that there is actual consumer confusion between Il Giglio and Il Mulino Tribeca. *See* Motion at 19. None are particularly persuasive. *Cf. New Hope Fam. Servs., Inc. v. Poole*, 966 F.3d 145, 165 (2d Cir. 2020) (noting that, on a motion for a preliminary injunction, district courts are "not required to accept [a plaintiff's] allegations as true or to draw all reasonable inferences in its favor"). Plaintiffs first proffer two customer reviews of Il Mulino Tribeca posted in October 2023, after the restaurant had

closed.  *See* Reinhard Decl., Exhs. DD, EE.  Plaintiffs claim that these reviews were "for Il Giglio," presumably inferring that these customers must have dined at the new restaurant, given the post dates, but then posted their reviews on the Google Maps page for Il Mulino Tribeca thinking they were in fact eating at that restaurant.  Motion at 19.  Yet nothing in these reviews indicates when the customers dined, nor do Plaintiffs advance any particular reason to believe that the customers in fact went to Il Giglio beyond the posting date of the review.  It may well be that the customers had gone to Il Mulino Tribeca—a restaurant that closed only the month before, *see* Katzoff Decl. ¶ 105—and belatedly posted their reviews on the former restaurant's Google Maps page.  Another *Tribeca Citizen* article that Plaintiffs proffer for actual confusion fares no better.  The article, dated September 19, 2023, featured a short blurb on Il Giglio, most notably stating that "I assume this is not to be confused with the former Il Giglio on Warren, but I will find out!"  Reinhard Decl., Exh. BB.  But the association with the old Il Giglio requires another logical step to get to confusion with the Il Mulino brand: while Plaintiffs have submitted evidence that suggests customers associated the former Il Giglio with Il Mulino in the 2000s and early 2010s, *id.*, Exh. O, whether customers continue to make that association today remains unclear from either the September 19 or September 22 *Tribeca Citizen* article or from any other evidence presented by Plaintiffs.[8]  In contrast, customer reviews at issue in other *Polaroid* analyses have more directly evidenced confusion.  *See, e.g.*, *CJ Prods. LLC v. Snuggly Plushez LLC*, 809 F. Supp. 2d 127, 155 (E.D.N.Y. 2011) (a case cited by Plaintiffs at Motion at 19 n.13 that featured such customer reviews as: "I

---

[8] To be sure, the September 22, 2023 *Tribeca Citizen* article does note that the owner of the old Il Giglio was Rose Masci and that she now partners with Katzoff at Il Giglio.  Reinhard Decl., Exh. W at 1.  Presumably, Ms. Masci is related to the Masci brothers who opened the first Il Mulino restaurant.  *See* Galligan Decl. at 3 n.1 ("During the time period when the Masci brothers operated Il Mulino, they also allowed certain family members to open a restaurant under the name Il Giglio in Tribeca.").  Nevertheless, the article does not draw that connection.

bought this thinking it was a real pillow pet but the brand is something else . . . [m]y only complaint is that the description acts like it is an actual Pillow Pet and it is not" (alteration in original)); *MOMACHA*, 339 F. Supp. 3d at 378-79 ("Another post showed a picture of a MOMACHA drink decorated with latte foam art in the shape of a marijuana leaf.  Someone commented on the post, 'I haven't been to MoMa in a while!  Great excuse.'").[9]

Plaintiffs' strongest evidence for actual confusion surfaced during the hearing, when Plaintiffs' counsel pointed to the fact that Open Table—a restaurant booking website—appears to list Il Giglio as "affiliated with" a number of Il Mulino restaurants as probative of actual confusion.  Tr. at 37:6-9; *see* Reinhard Decl., Exh. X.  This theory presents a slight departure from Plaintiffs' briefs, in which they claimed that Defendants purposefully "identified Plaintiffs' restaurants" as affiliated on Open Table, which would appear to be more probative of bad faith than actual confusion.  Motion at 11 (emphasis removed).  Defendants countered at the hearing that "[w]e don't control what's posted on the open internet. . . .  [C]ertainly that's not something that the [D]efendants control and are trying to use to . . . confuse any sort of customers."  Tr. at 49:8-14.  In any case, even assuming that Open Table listed the affiliation on its own accord, one piece of

---

[9] Plaintiffs also advanced an argument concerning Katzoff's contribution to the September 22, 2023 *Tribeca Citizen* article, in which Plaintiffs claim Katzoff "made statements directly to the press to try to associate" Il Giglio with the Il Mulino brand.  Motion at 11 (citing Reinhard Decl., Exh. W); *see* Tr. at 32:9-33:14.  This evidence is likely more probative of bad faith than actual confusion.  Indeed, Plaintiffs made a bad faith argument predicated thereon at the hearing.  *See* Tr. at 32:9-13.  And the case to which they cited in support of the proposition that Katzoff's statements and information provided to the reporter "engendered confusion on the part of consumers" is distinguishable.  *Id.* at 33:1-7 (citing *Hermès Int'l v. Rothschild*, 603 F. Supp. 3d 98, 106 (S.D.N.Y. 2022)).  The defendant in *Hermès* explicitly said that "there's not much difference" between the products and that "I feel like the difference between the two is getting a little bit blurred," 603 F. Supp. 3d at 101, in contrast with the *Tribeca Citizen* article saying that Il Giglio "has now been separated from the other and is its own entity—don't call it Il Mulino!", Reinhard Decl., Exh. W at 1.  Plaintiffs retort that "the entire article" would cause consumers to associate Il Giglio with Il Mulino, Tr. at 34:2, but that reading still downplays the explicit distinction drawn by the article.

evidence of actual confusion cannot be counted as "more than *de mimimis*."  *Jackpocket*, 645 F. Supp. 3d at 259 (internal quotation marks omitted).

In light of the above, this actual confusion factor is neutral.

   **v.**  **Bad Faith**

Turning to bad faith in adopting the mark, "[b]ad faith generally refers to an attempt by a junior user of a mark to exploit the good will and reputation of a senior user by adopting the mark with the intent to sow confusion between the two companies' products."  *Star Indus.*, 412 F.3d at 388.  Plaintiffs point to Katzoff's knowledge of Il Mulino's intellectual property writ large, a fact that Defendants do not appear to contest.  *Compare* Motion at 20 *with* Opposition at 27-28.  While Defendants accurately note that "[p]rior knowledge of a senior user's mark does not, without more, create an inference of bad faith," here there is record evidence to support at least an inference that Defendants have attempted to capitalize on the reputation of Il Mulino.  *Playtex Prods., Inc. v. Georgia-Pacific Corp.*, 390 F.3d 158, 166 (2d Cir. 2004), *superseded by statute on unrelated grounds as recognized in Starbucks Corp. v. Wolfe's Borough Coffee*, 588 F.3d 97, 107-08 (2d Cir. 2009).  As highlighted above, the striking similarities between Il Giglio's and Il Mulino Tribeca's décor may well illustrate copying, particularly given the fact that Defendants acknowledged that some of Il Mulino Tribeca's property was carried over.  The fact that Il Giglio's social media accounts have fairly blatantly reposted photos of Il Mulino Tribeca's interior only further underscores the point.  Reinhard Reply Decl., Exhs. UU, VV.  As the Second Circuit has held, "[w]here . . . prior knowledge is accompanied by similarities so strong that it seems plain that deliberate copying has occurred, we have upheld findings of bad faith."  *Paddington Corp. v. Attiki Importers & Distribs., Inc.*, 996 F.2d 577, 587 (2d Cir. 1993).  The Court finds that a similar conclusion is warranted here.  This factor thus weighs in Plaintiffs' favor.

### vi.   Quality of the Products

"The quality of a junior user's products 'is primarily concerned with whether the senior user's reputation could be jeopardized by virtue of the fact that the junior user's product is of inferior quality.'" *Jackpocket*, 645 F. Supp. 3d at 271 (quoting *The Sports Auth., Inc. v. Prime Hosp. Corp.*, 89 F.3d 955, 965 (2d Cir. 1996)).  Plaintiffs suggest that Katzoff's stated desire to make Il Giglio "a bit more casual" than Il Mulino Tribeca, Reinhard Decl., Exh. W at 1, illustrates the risk that "Defendants are lowering the quality of their offerings[,] [which] could harm Plaintiffs' reputation[,]" Motion at 21.  The extent to which Katzoff followed through on that stated approach remains unclear: as pointed out in the same article that reported Katzoff's expressed desire to make Il Giglio "a bit more casual," the restaurant "is still white-tablecloth and still expensive—the mains are between $48 and $68; the pastas in the high $30s; the salads in the low $20s" for dinner.  Reinhard Decl., Exh. W at 1.  However, from the Court's vantage point, the marked similarities between Il Giglio and the Il Mulino restaurants writ large produce another risk relevant to the quality analysis, and one that in some ways is the converse of a concern about inferior quality: that the products' "comparable quality may support the consumers' belief that the products emanate from the same source and thus contribute to consumer confusion." *Paco Sport, Ltd. v. Paco Rabanne Parfums*, 86 F. Supp. 2d 305, 326 (S.D.N.Y. 2000); *see also Morningside Grp. Ltd. v. Morningside Cap. Grp., L.L.C.*, 182 F.3d 133, 142 (2d Cir. 1999) (finding the quality of the products factor to "cut[] both ways" because while the defendant "does not provide inferior services and so does not harm [the plaintiff]'s reputation in that way[,] . . . the comparable quality of the two companies' services brings them into even closer proximity, thereby militating in favor of [the plaintiff]").  The Court has already described the various ways in which the Il Giglio and Il Mulino Tribeca offerings are similar in its discussion of other *Polaroid* factors, something which

the parties in general do not appear to seriously contest.  Viewed in this light, the quality of the products factor weighs in Plaintiffs' favor.

### vii.    Sophistication of the Purchasers

"This factor examines a buyer's attentiveness in evaluating a product or service[;] '[t]he more sophisticated the consumers, the less likely they are to be misled by similarity in marks.'" *Alzheimer's Disease & Related Disorders Ass'n*, 307 F. Supp. 3d at 298 (quoting *TCPIP Holding Co., Inc. v. Haar Commc'ns, Inc.*, 244 F.3d 88, 102 (2d Cir. 2001), *superseded by statute on unrelated grounds as recognized in Rolex Watch U.S.A.*, 2012 WL 5177517, at *3 n.7).  The parties generally appear to agree that this factor is neutral, and Plaintiffs point out that "the Italian restaurant services at issue are offered at a fairly moderate overall price point with less decision-making process when compared to, for example, a home appliance."  Motion at 21; *see also* Opposition at 29-30.  The Court agrees, particularly given the relatively scant evidence provided by the parties on this factor.  *See Two Hands IP LLC v. Two Hands Am., Inc.*, 563 F. Supp. 3d 290, 308 (S.D.N.Y. 2021) (noting, in the context of a restaurant, that "[d]espite the inferences that can be drawn from the menu's pricing, the 'lack of evidence precludes any useful conclusion on this issue'" (quoting *Hasbro, Inc. v. Lanard Toys, Ltd.*, 858 F.2d 70, 79 (2d Cir. 1988))).

### viii.    Overall Likelihood of Confusion

To recap, the similarity of the marks, competitive proximity, bad faith, and the quality of the products all weigh in Plaintiffs' favor.  Strength of the mark weighs perhaps only somewhat in Plaintiffs' favor, whereas bridging the gap is not relevant in this case, and actual confusion and the sophistication of the purchasers appear to be neutral.  Overall, while not all the factors weigh in their favor, the fact that the products are so similar, are in competitive proximity, and the evidence that Defendants may well have acted in bad faith by appearing to capitalize on Il Mulino's

reputation all militate toward the conclusion that that Plaintiffs are likely to succeed in showing a likelihood of confusion on the Il Mulino Tribeca Trade Dress.

### c. Conclusion

Because the Court finds that Plaintiffs are likely to succeed in showing both the protectability of the Il Mulino Tribeca Trade Dress and a likelihood of confusion, the Court concludes that Plaintiffs are likely to succeed on their Lanham Act claim with regards to the Il Mulino Tribeca Trade Dress.

### 2.   Il Mulino Marks

The Court next turns to Plaintiffs' Lanham Act claims with respect to the Il Mulino Marks, which are alleged to be "the U.S. registered trademarks IL MULINO and IL MULINO NEW YORK." Compl. ¶ 46(i). Plaintiffs have not shown a likelihood of success as to these claims. First, in terms of the validity and protectability of these marks, Plaintiffs assert that IM Asset Co "as exclusive licensee [of the Il Mulino Marks] has the right to bring suit to protect its rights in the Il Mulino marks." Motion at 13 (citing to *Allstar Mkting. Grp. v. andnov73*, No. 20 Civ. 9069 (PKC), 2023 WL 5208008, at *5 (S.D.N.Y. Aug. 14, 2023) ("[Plaintiff] is the exclusive licensee of the federally registered Baseboard Buddy Mark . . . . The mark is thus presumptively valid and protectable.")). Defendants do not appear to dispute the federal registration of the Il Mulino Marks, but vigorously dispute the exclusive licensee contention, pointing to Judge Glenn's decision in *In re KG Winddown, LLC* that Asset Co IM Rest, LLC (among other entities) essentially shared rights to the Il Mulino Marks with certain Katzoff-affiliated entities. *See* 632 B.R. at 473 ("[T]he Court finds that the 'exclusive' grant of rights in each license was limited to use of the licensed property *for certain purposes*."); *see* Opposition at 2. Plaintiffs, in turn, have questioned whether Judge Glenn's decision remains valid, *see* Dkt. 63 at 2-3, but this dispute is of no moment. Even

assuming that the Il Mulino Marks are valid and protectable, Plaintiffs have not shown that they are likely to succeed in showing a likelihood of confusion.

The Court's prior analysis of several of the *Polaroid* factors in the Il Mulino Tribeca Trade Dress context applies equally to the Il Mulino Marks; more specifically, the Court sees no need to reiterate its prior findings concerning competitive proximity, bridging the gap, actual confusion, quality of the products, and sophistication of the purchasers.  In contrast, strength, similarity, and bad faith all warrant separate discussion in the Il Mulino Marks context.[10]

### a.  Strength of the Marks

Neither party has fully developed any arguments on the strength of the Il Mulino Marks. Indeed, Plaintiffs relied in the most conclusory of fashions on the marks' federal registration, Motion at 16; yet, a trademark's "federal registration that has ripened into incontestable status does not support the conclusion that the mark is 'strong[,]'" *Alzheimer's Disease & Related Disorders Found.*, 307 F. Supp. 3d at 288 (quoting  2 McCarthy on Trademarks § 11:82 (5th ed.)). Nevertheless, in terms of inherent distinctiveness, it is necessary to distinguish between "Il Mulino" and "Il Mulino New York."  As to "Il Mulino," it may well be that many consumers in the New York area would recognize the name as an Italian word, and thus— "through . . . imagination, thought, and perception," *Star Indus.*, 412 F.3d at 385 (internal quotation marks omitted) —associate the restaurant chain's name with the Italian food it offers, which would render the mark suggestive. *Cf. Kerzner Int'l Ltd. v. Monarch Casino & Resort, Inc.*, 675 F. Supp. 2d 1029, 1041 n.4 (D. Nev. 2009) (noting that, were a seafood restaurant to have the name "Atlantis," "the mark would probably best be considered suggestive, as evocative of the

---

[10] Plaintiffs' previously noted confusion as a matter of law argument, *see supra* III.A.1.b, does not appear to apply to the Il Mulino Marks, since Defendants renamed the restaurant and Plaintiffs do not appear to claim that they own rights to the Il Giglio name.

ocean and thus seafood through the association with the legendary sunken continent of that name"). "Il Mulino New York" presents a different scenario, given the inclusion of the original restaurant's geographic location. *See Forschner Grp., Inc. v. Arrow Trading Co. Inc.*, 30 F.3d 348, 353-54 (2d Cir. 1994) ("[A] phrase or term that is descriptive of the geographic origin of a product will not receive trademark protection absent proof of secondary meaning. Conversely, a geographic term may enjoy trademark protection without a showing of secondary meaning when it is used in an arbitrary or suggestive manner, taking into account the nature of the goods or services at issue.").

However, a precise determination of whether the Il Mulino Marks are descriptive, suggestive, or even arbitrary is not necessary at this juncture, particularly given the paucity of the record on this issue. Under any of these classifications, the marks can be protected upon a showing of secondary meaning. *See RiseandShine Corp.*, 41 F.4th at 121 ("Descriptive marks are presumptively unprotectable, but can acquire a degree of protection if they have acquired secondary meaning, *i.e.*[,] an acquired public recognition as a mark identifying the source."). And Defendants do not argue—nor does the Court believe—that the Il Mulino Marks are generic, in which case they "receive[] no protection from the law of trademark, even if the mark has acquired public recognition as identifying the source of the product." *Id.* at 120. After all, the notion that the Il Mulino Marks are "common name[s], such as automobile or aspirin, that identif[y] a kind of product" strains credulity. *Id.*

In that context, the Court concludes from the record that Plaintiffs are likely to show that the Il Mulino Marks have acquired secondary meaning and that the marks "identify not only the goods, but the source of those goods." *Alzheimer's Disease & Related Disorders Ass'n*, 307 F. Supp. 3d at 289 (quoting *20th Century Wear, Inc. v. Sanmark-Stardust Inc.*, 815 F.2d 8, 10 (2d Cir. 1987)). As alluded to above, "[t]he indicia commonly recognized as showing secondary

meaning are (1) advertising expenditures; (2) consumers studies linking the name to a source; (3) sales success; (4) unsolicited media coverage; (5) attempts to plagiarize the mark; and (6) the length and exclusivity of the mark's use." *Id.*  Plaintiffs have proffered evidence of unsolicited media coverage, and—through said coverage—sales success and the length and exclusivity of the mark's use.  For example, a 2006 *New York Times* review of the Greenwich Village location noted that the restaurant was "still a tough reservation to score" and "jammed beyond belief" with customers decades after its 1981 opening.  Reinhard Decl., Exh. P-1 at 2.  Another article, from fall 2023, noted that the Greenwich Village location was "honored as the #1 Italian restaurant on the New York City *Zagat Survey* for an astonishing 20 years" and was "a premier destination for NYC's tastemakers."  Reinhard Decl. ¶ 4, Exh. Q-1.  Still another article, also from fall 2023, opined that "for over 30 years, the name Il Mulino has come to mean superb Italian food."  Reinhard Decl. ¶ 4, Exh. Q-2.  Defendants concede much the same, also citing the Zagat figure in their brief and stating that Il Mulino "has won numerous awards."  Opposition at 5.  All of these examples illustrate that the Il Mulino brand has acquired secondary meaning and more generally that the Il Mulino Marks are strong.

### b.  Similarity of the Marks

Turning to similarity, the parties vigorously dispute the extent to which Il Mulino and Il Giglio are similar.  Plaintiffs point primarily to the context in which consumers find the marks, noting that Il Giglio operates in the former Il Mulino Tribeca space and offers very similar services to the Il Mulino restaurants.  *See* Motion at 18.  They also reiterate the restaurant name's connection to the former Il Giglio, although—as the Court noted above, *see supra* III.A.1.b.iv— the extent to which today's consumers link the name to the Il Mulino brand remains unclear at this juncture.

The Court finds that the evidence is mixed as to this factor.  To be sure, consumers can and will find the marks in a similar context, in the same space where Il Mulino Tribeca was located (and at a restaurant with remarkably similar décor at that) and more generally at an Italian restaurant.  But courts also take into account the marks' "mode of presentation, typeface, inclusion of additional words, dress colors, and associated tie-ins" in conducting the similarity inquiry. *Flushing Bank v. Green Dot Corp.*, 138 F. Supp. 3d 561, 587 (S.D.N.Y. 2015).  The Il Mulino and Il Giglio marks are less similar on many of those metrics, although both share a black and white color scheme.  The marks' primary fonts are remarkably dissimilar, for instance. The Il Mulino Marks primarily showcase a relatively traditional, cursive font, whereas the Il Giglio mark is primarily defined by a modern-looking font, although, to be sure, the smaller "New York" and "Tribeca" fonts are more similar:



Reinhard Decl., Exh. P-2.



*Id.*, Exh. AA (excerpt). Plaintiffs' apparent reliance on the shared "il" is also unavailing: "without more striking visual similarities, the shared use of this ordinary word . . . is not enough to render the two products 'confusingly similar.'" *RiseandShine Corp.*, 41 F.4th at 125. The Court finds such a principle particularly compelling in the case of the masculine Italian word for "the," *see* Dkt. 51-26, which is used in the name of countless Italian restaurants in the New York City area, *see* Dkt. 51-25. And the words "mulino" and "giglio" differ in both sound and meaning: the former means "mill" while the latter means "lily." *See* Dkt. 51-27. In sum, given the differences in the restaurants' names and the primary fonts used, the Court determines that the similarity factor weighs slightly in Defendants' favor.

### c. Bad Faith

Bad faith also warrants a brief but separate discussion in the context of the Il Mulino Marks. Plaintiffs' primary argument appears to be that, by naming the restaurant Il Giglio, Defendants aimed to capitalize on Il Mulino's reputation, given the "sister restaurant" association detailed above. *See* Motion at 20 n.15. On one hand, Katzoff, in particular, likely knew about the relationship between the old Il Giglio and the Il Mulino brand, given the fact that the owner of the former Il Giglio "partners with Katzoff now" (at least according to the September 22, 2023 *Tribeca*

*Citizen* article), Reinhard Decl., Exh. W at 1, and Katzoff's intimate knowledge of the Il Mulino brand more generally.  However, as the Court has already explained, there is simply insufficient evidence in the record to show that consumers in 2023 would draw a connection between the former Il Giglio and the Il Mulino brand.  *See supra* III.A.1.b.iv.  In the absence of other evidence, this factor is neutral.

### d.  Conclusion

In sum, the strength of the mark, competitive proximity, and the quality of the products weigh in Plaintiffs' favor, but the five other factors are at best neutral, with similarity weighing slightly in Defendants' favor.  Thus, although the Il Mulino Marks are stronger than the Il Mulino Tribeca Trade Dress, the Court finds that the balance of the *Polaroid* factors militates against a finding of likelihood of confusion as to the Il Mulino Marks.  Plaintiffs are thus not likely to succeed on their Lanham Act claims as to the Il Mulino Marks.

### 3.  Recipes

Finally, the Court turns to the Il Mulino proprietary recipes.  Plaintiffs define these recipes as forming part of Il Mulino's intellectual property, *e.g.*, Motion at 7, in line with the original Il Mulino intellectual property license including recipes within its ambit, *see* Galligan Decl., Exh. A. Plaintiffs claim repeatedly that Il Giglio "serv[es] a menu of proprietary and recognizable Il Mulino recipes."  Motion at 11; *see also id.* at 14, 18.  This contention appears to be in large part based on the opinion of Brian Galligan, who, as noted above, was a longtime business partner of Katzoff's and someone "involved with the expansion of Il Mulino-branded restaurants."  Galligan Decl. ¶¶ 9, 18.  Galligan claimed that he "reviewed the Il Giglio Tribeca menu posted to its website . . . [and] it appears to [him] that Il Giglio Tribeca is likely serving a menu comprised almost entirely of the Il Mulino Recipes."  *Id.* ¶ 41.  According to Galligan, Katzoff "hired chefs for Il Giglio Tribeca

and had them train in the kitchen at Il Mulino West 3rd Street" in mid-2023, *id.* at ¶ 44 n.4; Plaintiffs also claim that Il Giglio's chef is a former Il Mulino chef, *see* Reply at 3. Plaintiffs more generally point to Il Giglio's social media accounts, which have posted nearly identical-looking photos of various dishes. *See, e.g.*, Reinhard Reply Decl., Exhs. QQ, RR. They also provided photos of similar looking preparations of branzino taken at Il Giglio and the Il Mulino restaurant on the Upper East Side. *See* Reinhard Reply Decl., Exh. XX. Katzoff, however, averred that "[n]o Il Mulino recipes were or are being used at Il Giglio." Katzoff Decl. ¶ 109. Plaintiffs retort that the evidence detailed above creates an inference that Katzoff's assertion is false. *See* Reply 2-3.[11]

This contradictory evidentiary record proves difficult for the Court to parse. It bears mention that the Court explicitly invited the parties to call witnesses at the evidentiary hearing, yet the parties declined to do so. Nor did Plaintiffs move for expedited discovery to aid factual development of this issue. *See Eyal R.D. Corp. v. Jewelex N.Y., Ltd.*, 576 F. Supp. 2d 626, 641 (S.D.N.Y. 2008) ("Expedited discovery and an evidentiary hearing commonly precede the court's order granting or denying a preliminary injunction."). In that context, the Court is left to grapple with, on one hand, Katzoff's assertion—made under penalty of perjury, *see* Katzoff Decl. at 13— that no Il Mulino recipes are used at Il Giglio and, on the other hand, Plaintiffs' evidence that they claim undercuts his assertion. *Cf. Davis v. N.Y.C. Hous. Auth.*, 166 F.3d 432, 437-38 (2d Cir. 1999) ("[W]hile affidavits may be considered on a preliminary injunction motion, motions for

---

[11] Plaintiffs also proffered a new theory in their reply brief in response to Katzoff's declaration, claiming that, even if no Il Mulino recipes are used at Il Giglio, the restaurant's plating could generate confusion. *See* Reply at 2-3. But, even if the Court were to disregard principles of reply-brief presentation, "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *Tolbert*, 242 F.3d at 75 (internal quotation marks omitted). "It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones." *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990). The Court will therefore decline to consider this argument.

preliminary injunction should not be resolved on the basis of affidavits that evince disputed issues of fact.").  And some of Plaintiffs' proffered evidence sheds little light on the potential use of Il Mulino recipes.  For instance, Galligan's claim in his declaration that he could deduce the use of "dish[es] that appear[] to be identical to many of the[] Il Mulino recipes" from the Il Giglio menu is difficult to reconcile with the fact that the Il Giglio menu reveals little about the recipes.  Galligan Decl. ¶ 43.  By way of example, Plaintiffs in particular highlight Il Mulino's "proprietary recipe for Pollo Alla Parmigiana which includes recognizable steps of pounding high-quality chicken into a round shape with the bone in and using homemade Milanese breadcrumbs, muenster cheese and dollops of Il Mulino's Marinara sauce and basil."  *Id.* ¶ 7(c).  Galligan appears to suggest that Defendants continue to use this recipe, or at least a nearly identical version thereof, under the name "Suprema Alla Parmigiana."  *Id.*  But all the Il Giglio menu—or at least a version Plaintiffs provided as part of a *Tribeca Citizen* article—states about that dish is "[b]readed chicken breast alla parmigiana, tomato sauce, broccoli."  Reinhard Decl., Exh. W at 4.  Defendants further attribute the fairly brazen use of identical social media posts, Reinhard Reply Decl., Exhs. MM (social media), OO (same), to the use of stock images, Tr. at 54:20-55:2, and while the photos of the Il Giglio branzino appear very similar to the equivalent Il Mulino dish, the Il Giglio photos do not appear to showcase the Gueridon for tableside deboning, which Plaintiffs contend is part of what makes the Il Mulino branzino preparation distinct, Reinhard Reply Decl., Exh. XX; *see* Compl. at 11 n.6 (alleging that "many of [Il Mulino's] . . . fish dishes us[e] partial preparation in the kitchen and a table-side finish (such as a distinct Branzino preparation, which is presented to the guest after being cooked and taken to the Gueridon for tableside deboning)").[12]   More

---

[12] To be sure, this evidence likely would have proven more relevant to a confusion-based theory as to the plating of dishes, but as explained, Plaintiffs failed to sufficiently develop such a theory. *See supra* n.11.

generally, the Court will not lightly impugn an assertion made under penalty of perjury. *Cf. Dye v. Kopiec*, No. 16 Civ. 2952 (LGS), 2016 WL 7351810, at *3 (S.D.N.Y. Dec. 16, 2016) (noting that, on summary judgment, "[e]ven a self-serving affidavit can establish a genuine dispute of fact so long as the affidavit does not contradict the witness's prior testimony").

Simply put, Plaintiffs have not proffered sufficient evidence nor adequately developed an argument that would show a likelihood of success on the merits as to the recipes. *Cf. N.Y.C. Env. Justice All. v. Giuliani*, 214 F.3d 65, 68 (2d Cir. 2000) ("If [moving parties] do not present sufficient facts or statistics to back their assertions, the paucity of the evidence in the record will prevent us from holding that they have shown a likelihood of success." (internal quotation marks omitted)).

Plaintiffs' best showing could be under the Second Circuit's "serious questions" standard, which "permits a district court to grant a preliminary injunction in situations where it cannot determine with certainty that the moving party is more likely than not to prevail on the merits of the underlying claims, but where the costs outweigh the benefits of not granting the injunction." *Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010).  But Plaintiffs under that standard must "establish that the balance of hardships tips *decidedly* in [their] favor," and the Court concludes that Plaintiffs have not made such a showing. *Id.* (internal quotation marks omitted).  Even assuming Il Giglio does use Il Mulino recipes, whatever damage the use thereof would cause in these early stages of litigation to "the strong reputation and consumer goodwill that Plaintiffs have earned through hard work and investment," Motion at 11—a notion that the Court generally credits, as discussed below, *see infra* III.B, C— cannot be said to *decidedly* outweigh the ramifications of enjoining the use of "all but a handful of menu items," Galligan Decl. ¶ 44.  As Defendants point out, much as "[m]ajor disruption of a

business can be as harmful as its termination and thereby constitute irreparable injury," the same principle can apply to the balance of hardships. *Petereit v. S.B. Thomas, Inc.*, 63 F.3d 1169, 1186 (2d Cir. 1995); *see* Opposition at 32. Reconfiguring a majority of Il Giglio's menu could very well constitute a major disruption. Indeed, Plaintiffs point to their allegation that Katzoff trained chefs to "learn proprietary Il Mulino recipes and food service techniques" months in advance of Il Giglio's opening, Motion at 10; *see* Compl. ¶¶ 10, 126; Galligan Decl. at ¶ 44 n.4; it may well be that reorienting chefs to a menu replete with new recipes could equally take a significant amount of time and resources.

The Court thus declines to enter injunctive relief with respect to the recipes at this juncture. To be clear, this conclusion is not to suggest that Plaintiffs cannot establish their entitlement to injunctive relief with respect to certain recipes after further development of the record.

**B.    Irreparable Harm**

"A showing of irreparable harm is 'the single most important prerequisite for the issuance of a preliminary injunction.'" *Two Hands IP*, 563 F. Supp. 3d at 298 (quoting *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009)). "It is well established that an irreparable injury is an injury that is not remote or speculative but actual and imminent, and for which a monetary award cannot be adequate compensation." *Dexter 345 Inc. v. Cuomo*, 663 F.3d 59, 63 (2d Cir. 2011) (internal quotation marks omitted). "Irreparable harm exists in a trademark case 'when the party seeking the injunction shows that it will lose control over the reputation of its trademark pending trial,' because reputation is 'not calculable nor precisely compensable.'" *Two Hands IP*, 563 F. Supp. 3d at 300 (quoting *Power Test Petroleum Distribs., Inc. v. Calcu Gas, Inc.*, 754 F.2d 91, 65 (2d Cir. 1985)).

The Court turns to irreparable harm in two contexts: (1) Plaintiffs' Lanham Act claims as to the Il Mulino Tribeca Trade Dress and (2) the Il Mulino Tribeca Personal Property.

### 1.     Il Mulino Tribeca Trade Dress

As Plaintiffs note, *see* Motion at 23, "[f]ollowing the enactment of the Trademark Modernization Act of 2020, a plaintiff seeking a preliminary injunction is entitled to a rebuttable presumption of irreparable harm upon a court's finding a likelihood of success on the merits." *Two Hands IP*, 563 F. Supp. 3d at 300; *see* 15 U.S.C. § 1116(a) ("A plaintiff seeking any . . . injunction [under, *inter alia*, Section 43 of the Lanham Act] shall be entitled to a rebuttable presumption of irreparable harm . . . upon a finding of likelihood of success on the merits for a violation identified in this subsection in the case of a motion for a preliminary injunction . . . .").  "Thus, if (1) the plaintiff establishes that it has a likelihood of success on the merits (that is, it establishes both the validity of its mark and a likelihood of confusion), <u>and</u> (2) the defendant fails to rebut the presumption, the plaintiff satisfies its burden of showing irreparable harm."  *Two Hands IP*, 563 F. Supp. 3d at 300 (emphasis in original).

Defendants have failed to rebut the presumption.   Indeed, Defendants appear to misunderstand the presumption, stating that "Plaintiffs only offer conclusory statements" to show irreparable harm and that "Plaintiffs provide no evidence as to *how* they will suffer the[] harms" they do identify, like reputational damage.  Opposition at 31; *see* Motion at 23 ("[T]here is a likelihood of irreparable harm due to Plaintiffs' loss of control over their reputation, goodwill, and business opportunities, as well as loss of control over their rights in the Il Mulino IP.").  Simply pointing to the ostensible lack of specificity in Plaintiffs' arguments does not suffice to rebut the presumption.   And Defendants' argument about themselves suffering irreparable harm, *see* Opposition at 32, is better suited to the balance of equities discussion, as detailed below.  The

Court thus concludes that Plaintiffs are entitled to the statutory presumption of irreparable harm as to the Il Mulino Tribeca Trade Dress, which Defendants have not rebutted.

### 2. Il Mulino Tribeca Personal Property

Thus far, the Court has discussed all of Plaintiffs' specific requests for injunctive relief except for the "us[e] [of] any of the Il Mulino Tribeca Personal Property." Dkt. 23 at 2. To be sure, to the extent that the Personal Property is used in the Il Mulino Tribeca Trade Dress, Defendants will be enjoined from using that property as detailed below. However, it does not appear that all, or perhaps even most, of what Plaintiffs define as the Il Mulino Tribeca Personal Property forms part of the Trade Dress. For instance, the Complaint mentions "tableware . . . and tens of thousands of dollars of alcohol" as part of the Il Mulino Tribeca Personal Property; these items are not included within the scope of the Trade Dress as defined by Plaintiffs. Compl. ¶ 57.

With respect to any of the Il Mulino Tribeca Personal Property that does not form part of the Trade Dress, the Court declines to grant relief related thereto because Plaintiffs have failed to show irreparable harm.[13] Plaintiffs appear to make two conclusory arguments about irreparable harm in the Personal Property context. In the Complaint, Plaintiffs claim that "IM Joint Ventures will be irreparably harmed by the complete loss of value from the Il Mulino Tribeca Personal Property." Compl. ¶ 145. They also claim in their motion that "Plaintiffs will irreparably lose their ability to control their . . . personal property interest" in the absence of an injunction. Motion at 11. The Court does not find irreparable harm on the basis of these barebones arguments. *Cf. M.V. Music v. V.P. Records Retail Outlet, Inc.*, 653 F. Supp. 3d 31, 39 (E.D.N.Y. 2023) ("[C]onclusory

---

[13] The Court also does not understand the act of Defendants retaining the Il Mulino Tribeca Personal Property to form a basis of Plaintiffs' Lanham Act claims—indeed, the Complaint does not name the Personal Property in the relevant causes of action. Therefore, the presumption of irreparable harm is irrelevant here.

statements of loss of reputation and goodwill constitute an insufficient basis for a finding of irreparable harm." (internal quotation marks omitted)).  Indeed, parts of the Complaint appear to suggest that monetary damages could make Plaintiffs whole with regard to the Il Mulino Tribeca Personal Property, and the Court cannot discern any reason why such damages would not suffice to cover Plaintiffs' alleged loss.  *See, e.g.*, Compl. ¶ 247 ("As a direct and proximate result of Defendants' wrongful acts of civil conversion [of the Il Mulino Tribeca Personal Property], Plaintiff IM Joint Ventures has suffered monetary damages in an amount equal to its loss of its rights to the Il Mulino Tribeca Personal Property."); *id.* at 68 (noting that Plaintiffs seek "[a] declaration that Defendants must sell the Il Mulino Tribeca Personal Property and/or pay to Defendant IMNY GS a market rate in exchange for acquiring it, and awarding Plaintiff IM Joint Ventures an amount equal to fifty-five (55) percent of the total purchase price, consistent with its proportionate ownership of IMNY GS").  After all, "[w]here there is an adequate remedy at law, such as an award of money damages, injunctions are unavailable except in extraordinary circumstances."  *Faiveley Transp. Malmo AB*, 559 F.3d at 118 (internal quotation marks omitted). The Court thus denies injunctive relief with respect to the non-Trade Dress Il Mulino Tribeca Personal Property, and, furthermore, declines to delve into the merits of Plaintiffs' New York law arguments as to that property given the preceding irreparable harm analysis.

**C.**      **Public Interest and Balance of the Hardships**

The Court is thus left to analyze the public interest in the context of the Lanham Act trade dress claim.  Briefly stated, there is a "strong interest in preventing public confusion."  *ProFitness Physical Therapy Ctr. v. Pro-Fit Orthopedic & Sports Physical Therapy P.C.*, 314 F.3d 62, 68 (2d Cir. 2002); *see also Guru Teg Holding*, 581 F. Supp. 3d at 475 ("The Second Circuit has long held that there is a strong interest in preventing public confusion." (internal quotation marks omitted)).

So too here.  Contrary to Defendants' assertions, Plaintiffs' argument is not simply rooted in the enforcement of trademark law writ large.  *See* Opposition at 34.  Rather, Plaintiffs' argument focuses on the specific harms of consumer confusion between the Il Mulino and Il Giglio brands.

As for the balance of equities, the Court acknowledges that Defendants will have to change aspects of Il Giglio's décor as a result of the injunction, as detailed below.  *See infra* IV.  However, given the Court's denial of much of Plaintiffs' requested injunctive relief, the notion that "Il Giglio would have to shut down" as a result of the injunction strains credulity.  Opposition at 32-33.  Il Giglio can continue to operate as an Italian restaurant at its current location with the necessary modifications to its décor.  Plaintiffs, on the other hand, risk having their goodwill and their control over Il Mulino's intellectual property weakened—a risk that is perhaps harder to quantify, but a cognizable risk nonetheless.  The Court thus concludes that the public interest and the balance of the equities favor the issuance of a narrowly tailored injunction.

## IV.  Conclusion

For the foregoing reasons, the Court determines that Plaintiffs have established a likelihood of success on the merits of their Lanham Act claims as to the Il Mulino Tribeca Trade Dress, and further have shown irreparable harm and that the public interest favors an injunction.[14]  Plaintiffs therefore are entitled to an injunction prohibiting Defendants from using trade dress similar to the Il Mulino Tribeca Trade Dress.  The parties are ordered to meet and confer to discuss a joint proposed order of injunctive relief consistent with this Opinion, which shall be filed by January 23, 2024.  If the parties are unable to agree on a joint proposed order, each party shall submit their proposal for an order by January 26, 2024.  Given the relative narrowing of the injunctive relief

---

[14] In light of this holding, the Court does not reach Plaintiffs' state law claim for unfair competition.

from the parties' initial briefing, by January 23, 2024, the parties shall also file letter briefs no longer than three pages setting out their positions on whether the Court should require a bond or security under Federal Rule of Civil Procedure 65.  Finally, the parties shall provide by January 23, 2024 a joint letter with a proposed briefing schedule for Defendants' anticipated motions to dismiss, *see* Dkts. 57-62, in the event that Defendants continue to intend to bring such motions. Injunctive relief is stayed pending the Court's entry of a written injunction order.  On that note, the Court understands that the parties have now engaged in several rounds of fairly acrimonious litigation broadly related to this case.  The parties are expected to meet and confer in a professional and civil manner, and endeavor in good faith to fashion a proposed order of injunctive relief consistent with this Opinion.  The Clerk of Court is respectfully directed to close Docket Number 23.

       SO ORDERED.

Dated: January 16, 2024
      New York, New York

                                           JOHN P. CRONAN
                             United States District Judge